### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN JOE BYLER,** | : | **Civil No.  3:23-CV-960** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security**[1] | : | |
| | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

### I.    <u>Introduction</u>

The plaintiff in this case, Kevin Joe Byler, has a remarkably complex medical,

legal and employment history. The complications which Byler's murky background

presented for the Social Security Administrative Law Judge (ALJ) who heard his

latest application for benefits were best exemplified by the manner in which Byler

participated in his agency disability hearing. Byler attended this hearing remotely

due to the fact that he was incarcerated on strangulation, unlawful restraint and

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

simple assault charges. (Tr. 40). Moreover, Byler's employment history revealed that during the period of his claimed disability, he had worked, albeit only briefly, at several jobs.

Presented with this complicated, and somewhat contradictory, legal, medical and employment background, and recognizing that a number of medical opinions indicated that Byler retained the physical and mental ability to perform a range of light work in a low stress environment, the ALJ denied this disability claim. Byler now broadly challenges this decision. In considering Byler's arguments, we are enjoined to apply a deferential standard of review, a standard of review which simply asks whether there is "substantial evidence" supporting the Administrative Law Judge's (ALJ) determination. With respect to this legal guidepost, as the Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

> Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In the instant case, after an independent review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   Statement of Facts and of the Case

### A. Introduction

On September 14, 2020, Kevin Joe Byler filed a Title II application for a period of disability and disability insurance benefits with the Social Security Administration, alleging disability beginning November 29, 2019. (Tr. 17). This application was the latest in an extensive series of disability applications submitted by Byler over the past two decades.[2] According to Byler, he was totally disabled due

---

[2] Byler appears to have previously filed disability claims in 2011 and 2014. (Tr. 61). Byler's 2011 application appears to have been denied and was not further contested. Byler's 2014 application was also denied but Byler appealed the 2014 adverse decision to this Court and at the Commissioner's request the case was remanded in

to a series of medical conditions, including migraines, venous insufficiency, obesity, bipolar disorder, borderline personality disorder, and post-traumatic stress disorder (PTSD). (Tr. 19). Byler was born was born on August 22, 1977, and was 42 years old, which is defined as a younger individual by the Commissioner's regulations, at the time of this alleged onset of his disability. (Tr. 28). He had a high school education and had previously worked as a landscaper, HVAC helper, store laborer or warehouse associate, cashier, and as a retail supervisor. (Id.)

## B. __Clinical Record, Byler's Physical Impairments__

While the principal issues in this appeal relate to Byler's mental impairments, the record also shows that he suffered from three physical conditions that affected his ability to work: migraines, venous insufficiency, and obesity. With respect to these issues, the clinical evidence reveals the following:

The clinical record consistently shows that Byler was obese but also contains substantial evidence indicating that this condition was not disabling. During the pertinent period, Byler's weight fluctuated between 260 and 300 pounds, and his body mass index or BMI was often calculated at 37 which fell within the clinically

---

October of 2018. Byler v. Berryhill, Civil No. 1:18-cv-29. He was then apparently granted a closed period of disability from April 2014 to August 2016. (Tr. 38). The instant application then followed on September 14, 2020, alleging a new onset of disability in December of 2019 more than three years after his closed period of disability came to an end.

obese range. (Tr. 60, 1143-1210). However, despite these consistent reports of obesity, Byler described an active lifestyle which included landscaping work, cooking meals, laundry, other chores at home, shopping, online social media activity and socializing with others. (Tr. 235-40, 1164, 1239, 1259). Moreover, a consultative examination of Byler conducted in July of 2021 revealed that he was in no acute distress, had a normal gait and stance, could walk without difficulty, and retained the ability to perform a 60% squat. (Tr. 1239).

Byler was also diagnosed as suffering from migraine headaches. (Tr. 1143-45). However, he treated this condition with medications and clinical records indicated that this condition was generally well controlled. (Id.) Thus, in June of 2019, Byler indicated that the migraines were "alright," (tr. 1146); in September 2019 he described the frequency and severity of these migraine headaches as occasional and slight, (tr. 1150); in April of 2020 Byler stated that he had not experienced migraine symptoms since the prior November, (tr. 1157); during a June 2020 acute migraine episode Byler reported significant and almost complete relief with Benadryl treatment, (tr. 1123); and in September 2020 Byler characterized the severity of these migraines as slight. (Tr. 1164).

In addition, Byler was diagnosed as experiencing veinous insufficiency in his legs, a condition that was treated through minor surgery, a bilateral high ligation.

5

(Tr. 916-34). While Byler later occasionally complained of leg swelling, particularly following prolonged or strenuous activity, (tr. 1164, 1174, 1238), at Byler's December 8, 2021, disability hearing, the plaintiff testified that compression stockings typically helped ameliorate this condition and he never missed work due to leg swelling. (Tr. 50).

### C. **Clinical Record, Byler's Emotional Impairments**

With respect to his mental impairments, Byler's clinical records presented a more complex, albeit, equivocal, picture. Prior to this alleged date of onset in November of 2019, Byler was twice briefly hospitalized in May and July of 2019 after expressing some suicidal ideation. (Tr. 408-503, 965-1012). In each instance, he reportedly responded well to treat and displayed improved functioning at the time of discharge. (Tr. 503).

Following his alleged date of onset, Byler was hospitalized on one other occasion in March of 2020 after voicing suicidal thoughts. (Tr. 313-400). While undergoing inpatient treatment, Byler displayed normal thoughts, speech and orientation but limited and poor insight and judgment. (Tr. 335, 347, 350, 357, 367, 383, 390, 398). By March 31, 2020, he was deemed ready for discharge and was discharged with an improved mood. (Tr. 396, 400).

Throughout the relevant period, Byler also received treatment through the Wellspan health system, and mental health treatment at Merakey Pennsylvania where his principal caregivers were Luciano Picchio and Maria Herrada. Merakey treatment records spanning 2020 and 2021 consistently reflected benign, normal and largely unremarkable assessments of Byler's mental state. (Tr. 1044, 1048, 1054, 1060, 1066, 1077, 1324, 1330). Likewise, from 2019 through 2021 treating sources at Wellspan routinely reported that Byler was doing well, felt well, and demonstrated normal range of motion, affect, thought and mood. (Tr. 1155, 1159, 1162, 1165, 1180, 1200, 1202, 1206, 1208, 1259-60, 1291, 1294, 1311).

In the Fall of 2021 Byler was incarcerated after he was charged with strangulation, unlawful restraint, and simple assault. (Tr. 39-40). While in custody, Byler was seen by Aron Ross, LSW. (Tr. 1435-44). LSW Ross reported one instance in which Byler voiced thoughts of self-harm in response to alleged harassment by other inmates but otherwise described him as displaying a low risk of self-injury and generally reported that the plaintiff was fully oriented with his judgment and insight intact. (Id.)

### D. Byler's Activities of Daily Living

Furthermore, Byler's reported activities of daily living also suggested that he retained the capacity to perform some sustained work. At various times, Byler

described an active lifestyle which included cooking meals, laundry, other chores at home, shopping, online social media activity and socializing with others. (Tr. 235-40, 1164, 1239, 1259). Notably, Byler also worked, albeit intermittently, during this alleged period of disability. Thus, it appears that Byler had held as many as ten jobs since April 2019.[3] (Tr. 44, 191-97). He worked at CVS and Carlisle Electronics, (tr. 41, 180), as well as performing landscaping during this period of claimed disability. (Tr. 1164, 1259). In 2020 he had a reported income of nearly $3,000. (Tr. 190).

## E.  **The Medical Opinion Evidence**

In Byler's case, there is no indication that any treating source opined that his physical and emotional impairments were disabling. Instead, the medical opinion evidence came from non-treating, non-examining state agency experts and one examining, consultative source. None of these medical sources deemed Byler to be totally disabled.

In an initial disability determination, Dr. Kevin Hollick opined that Byler retained the physical capacity to perform medium exertional work. (Tr. 78). Dr. Karen Plowman, in turn, found that Byler was moderately impaired in a number of

---

[3] This work history, like much of Byler's clinical history, is admittedly somewhat equivocal. The fact that Byler worked certainly suggested a capacity to work; yet the fact that Byler struggled to maintain employment permitted an inference that he might face emotional barriers to sustained work.

spheres of workplace function, (tr. 67, 75), but concluded that he could perform simple routine tasks. (Tr. 76).

Upon reconsideration, a second state agency mental health expert, Dr. Thomas Fink, agreed with Dr. Plowman's conclusion that despite his moderate mental impairments Byler retained the ability to perform simple routine tasks. (Tr. 99-100). With respect to Byler's physical impairments, on reconsideration, a second state agency expert, Dr. Louis Tedesco, opened that he could perform light work. (Tr. 96). Finally, in July of 2021, Dr. Ahmed Kneifati conducted a physical examination of Byler. (Tr. 1238-47). Dr. Kneifati found that Byler was in no acute distress, had a normal gait and stance, could walk without difficulty, retained the ability to perform a 60% squat, had 5/5 strength in all extremities, had intact manual dexterity, and was largely unlimited in his physical activities. (Id.)

It was against this medical background that Bowers' case came to be considered by the ALJ.

### F. **The ALJ Hearing and Decision.**

A hearing was conducted in this case on December 8, 2021, at which Byler and a vocational expert testified. (Tr. 35-59). Byler testified remotely from prison where he was being held on state charges. (Tr. 39-40). While Byler generally described his impairments as disabling, some of his statements placed his claim in a

more uncertain light. For example, Byler acknowledged brief episodes of employment during this period of claimed disability. (Tr. 41, 44). He also testified that, with medication, his mood stabilized somewhat, (tr. 43), and he could usually handle his anxiety pretty well. (Tr. 45). In addition, he reported that he never missed work due to his leg swelling. (Tr. 50).

Following this hearing, on April 12, 2022, the ALJ issued a decision in Byler's case. (Tr. 14-34). In that decision, the ALJ first concluded that Byler had not engaged in substantial gainful activity since November 29, 2019, the alleged onset date and met the insured status requirements of the Social Security Act through December 31, 2024. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Byler had the following severe impairments: migraines, venous insufficiency, obesity, bipolar disorder, borderline personality disorder, and post-traumatic stress disorder (PTSD). (Id.)

At Step 3, the ALJ determined that Byler did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 20-23). On this score the ALJ expressly considered the severity of Byler's emotional impairments but found that:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.08, and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To

satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has mild limitations. The claimant completed high school and was able to perform skilled work in the past (HR). From August of 2019 to June of 2020, Mr. Picchio observed normal thought process, logic, goal direction, and perception (Ex. B4F/6-36). From March of 2020, Ms. Gonzalez found normal coherence, thought process, fund of information, associations, logic, and memory. The claimant could name common objects, repeat phrases, and use good vocabulary and judgement (Ex. B1F/17-89; B2F/67-124). In July of 2020, Ms. Vesek found normal fund of knowledge, memory, and comprehension (Ex. B5F/9). From June to September of 2021, Ms. Herrada found normal thought process, associations, memory, and fund of knowledge (Ex. B15F/7-13). The education history; performance of skilled work in the past; ability to understand and answer questions exams and at the hearing; and the negative findings of normal thought process, associations, intelligence, fund of knowledge, judgment, and memory do not support moderate limitations in this area.

In interacting with others, the claimant has moderate limitations. From August of 2019 to June of 2020, Mr. Picchio noted improving trauma symptoms. Mr. Picchio observed normal speech, language, appearance, behavior, cooperation, and affect (Ex. B4F/6-36). In March of 2020, while an inpatient, Ms. Gonzalez found moderate distress, somewhat quiet presentation, and depressed mood. Ms. Gonzalez noted poor social judgement on intake, but it improved with care and medications. The claimant reported he did not get along well with some staff members. The claimant was cooperative with treatment and behaved normally. Ms. Gonzalez reported normal behavior, cooperation, eye contact, speech, affect, and social judgement (Ex. B1F/17-89). From June to September of 2021, Ms. Herrada found normal speech, affect, social judgment, and language (Ex. B15F/7-13). The claimant's

relationships; ability to go to public places and participate in activities; and the negative findings of normal speech, behavior, affect, cooperation, lack of conflict, and eye contact do not support marked limitations in this area.

With regard to concentrating, persisting, or maintaining pace, the claimant has mild limitations. From August of 2019 to June of 2020, Mr. Picchio observed normal alertness, orientation, thought process, goal-direction, and perception (Ex. B4F/6-36). In March of 2020, Ms. Gonzalez found normal orientation, consciousness, thought process, attention, concentration, and perception. The claimant could spell 'world' backwards, name common objects, repeat phrases, and use good vocabular and judgement (Ex. B1F/17-89; B2F/67-124). In July of 2020, Ms. Vesek found normal alertness, orientation, attention span, and perception (Ex. B5F/9). From June to September of 2021, Ms. Herrada found normal thought process, attention, and concentration (Ex. B15F/7-13). The participation in mental status exams; the ability to initiate and complete basic activities; and the negative findings of normal impulse control, alertness, attention span, concentration, perception, thought content, and orientation do not support moderate limitations in this area. 2

As for adapting or managing oneself, the claimant has experienced moderate limitations. From August of 2019 to June of 2020, Mr. Picchio noted improving trauma symptoms. Mr. Picchio found normal insight, judgement, hygiene, behavior, cooperation, mood, and thought content (Ex. B4F/6-36). From March of 2020, while an inpatient, Ms. Gonzalez found moderate distress, depressed mood, and self-harmful thoughts. Ms. Gonzalez noted poor insight and judgement on intake, but it improved with care and medications. The claimant reported loud noises trigger past trauma. The claimant reported he did not get along well with some staff members. The claimant was cooperative with treatment and behaved normally. Ms. Gonzalez reported normal appearance, behavior, hygiene, cooperation, insight, and judgement (Ex. B1F/17-89). From June to September of 2021, Ms. Herrada found normal mood, thought content, insight, and judgment (Ex. B15F/7-13). The treatment history; the ability to manage personal care, activities, and medical care; the lack of inpatient treatment or decompensation and

12

dependence on others; and the negative findings of normal hygiene and grooming, mood, insight, judgment, and mood control do not support marked limitations in this area. Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 20-22).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity

("RFC") for the plaintiff which considered all of his impairments as reflected in the

medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b); can frequently climb ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme cold, noise, vibrations, fumes, odors, dusts, gases, and other pulmonary irritants; can perform simple and routine tasks, involving only simple, work-related decisions; can tolerate few, if any, work place changes; cannot perform production pace work; and can occasionally interact with supervisors, coworkers, and the public.

(Tr. 23).

In reaching this conclusion, the ALJ thoroughly discussed Byler's clinical

history and activities of daily living. (Tr. 24-26). The ALJ also discussed each of the

medical opinions in this case—none of which found Byler's impairments to be

disabling—before adopting the most restrictive RFC suggested by these opinions.

(Tr. 26-27).

Having made these findings, the ALJ concluded that Byler could not perform his past relevant work but that there were other jobs that existed in significant numbers in the national economy that he could perform. (Tr. 27-30). Accordingly, the ALJ concluded that Byler had not met the stringent standard of disability set by law and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Byler broadly challenges this decision, arguing that the ALJ erred at Step 3 of this analysis and in the formulation of Byler's RFC. These issues are fully briefed by the parties and are, therefore, ripe for resolution.

Upon consideration, we find that substantial evidence supported the ALJ's findings that these impairments were not fully disabling. Accordingly, we will affirm the decision of the Commissioner.

## III.   Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

14

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the

agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

16

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could

18

function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of

19

the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at

*5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

C. **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is illustrated by those cases which consider analysis of a claimant's reported symptoms. When evaluating lay testimony regarding a claimant's reported symptoms we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

> Yet, it is also clear that:
>
> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015)(footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the

25

individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–

3p. This includes but is not limited to medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019

WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

### D. Legal Benchmarks for Assessing a Claimant's Obesity

Finally, the interplay between this deferential substantive standard of review, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is aptly illustrated by those cases which consider analysis of the compounding effect of obesity upon disability claimants. In this regard, the leading case addressing this issue is Diaz v. Comm'r of Soc. Sec., 577 F.3d 500 (3d Cir. 2009). In Diaz, the ALJ found at Step 2 of the analytical process that Diaz's obesity was a severe impairment but then neglected to address the exacerbating effect of this condition at Step 3 or in any other subsequent steps in the disability analysis.

On these facts, the Court of Appeals remanded the case for further consideration by the Commissioner and provided guidance regarding the duty of articulation required from ALJs in this setting. Thus, the Court of Appeals explained that "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at

28

step three and at every subsequent step." Diaz, 577 F.3d at 504. While imposing this responsibility of articulation upon ALJs, the appellate court did not endeavor to impose some strict formulaic requirements upon these administrative adjudicators. Quite the contrary, the Court made it clear that "[t]he ALJ, of course, need not employ particular 'magic' words: '[Case law] does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.' " Diaz, 577 F.3d at 504 (citations omitted).

The Court of Appeals also made it abundantly clear that its decision related to the ALJ's duty to adequately articulate the rationale underlying any decision denying benefits and did not in any way alter the very deferential substantive standard of review in these cases. As the Court noted,

> Were there *any* discussion of the combined effect of [obesity upon] Diaz's impairments, we might agree with the District Court [and affirm the ALJ decision]. However, absent analysis of the cumulative impact of Diaz's obesity and other impairments on her functional capabilities, we are at a loss in our reviewing function.

Diaz, 577 F.3d at 504 (emphasis in original). By noting that "*any* discussion of the combined effect of [obesity upon] Diaz's impairments" would have been sufficient, the appellate court underscored the continuing vitality of the deferential standard of review that applies in these cases.

29

Thus, fairly construed, <u>Diaz</u> holds that where an ALJ has defined a claimant's obesity as a severe impairment at Step 2 of this analysis, there is a basic duty of articulation that is owed the claimant, explaining how that obesity affects the issue of disability. However, once that duty of articulation is met, the substantive standard of review remains highly deferential. Applying this analytical paradigm, following <u>Diaz</u> it has been held that a single cursory assurance that an ALJ has considered a claimant's obesity may be insufficient to satisfy the requirement that "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." <u>Diaz,</u> 577 F.3d at 504; <u>see also</u> <u>Sutherland v. Berryhill</u>, No. 3:17-CV-00124, 2018 WL 2187795, at *9 (M.D. Pa. Mar. 6, 2018), <u>report and recommendation adopted sub nom. Sutherland v. Berryhill</u>, No. CV 3:17-0124, 2018 WL 2183359 (M.D. Pa. May 11, 2018). However, a statement by an ALJ in a decision denying benefits that the ALJ has "considered any additional and cumulative effects of obesity," when coupled with even a brief factual analysis of the medical evidence as it relates to obesity and impairment is sufficient to satisfy this duty of articulation. <u>Cooper v. Comm'r of Soc. Sec.</u>, 563 F. App'x 904, 911 (3d Cir. 2014). Further, when an ALJ considers the role of a claimant's obesity, evaluating it within the context of the overall record, consistent with the appropriate

guidelines, this duty is satisfied. <u>Woodson v. Comm'r Soc. Sec.</u>, 661 F. App'x 762, 765 (3d Cir. 2016). Finally, this responsibility is met when the ALJ explicitly considers the claimant's obesity when assessing that claimant's residual functional capacity. <u>Hoyman v. Colvin</u>, 606 F. App'x 678, 680 (3d Cir. 2015). <u>Medina v. Berryhill</u>, No. 3:17-CV-1941, 2018 WL 3433290, at *6–7 (M.D. Pa. June 8, 2018), <u>report and recommendation adopted,</u> No. CV 3:17-1941, 2018 WL 3426408 (M.D. Pa. July 16, 2018).

### E. **The Commissioner's Decision Will Be Affirmed**.

In the instant case, Byler invites us to set aside an ALJ's Step 3 findings and RFC assessment. In considering these arguments, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the ALJ 's Step 3 analysis and RFC assessment.

31

Turning first to the ALJ's Step 3 analysis, at Step 3 the ALJ is required to determine whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. § 416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one. To be found disabled under step three, a claimant must present medical evidence or a medical opinion that his or her impairment meets or equals a listing. An administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence in the record. Maddox v. Heckler, 619 F. Supp. 930, 935-936 (D.C. Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, § 3:22 (2014), *available at* Westlaw SSFEDCT. However, it is the responsibility of the ALJ to identify the relevant listed impairments, because it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Burnett, 220 F.3d at 120 n.2.

On this score, case law "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function . . . is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as a whole," id., permits a meaningful review of the SLJ's Step 3 analysis.

Judged by these guideposts, Byler's challenge to the Step 3 analysis in this case fails. That analysis was grounded in the clinical and medical opinion record.

33

While that record revealed an isolated instance of severe impairment due to suicidal ideation during the relevant period, the record was also replete with relatively unremarkable findings, and every expert who reviewed the record concluded that Byler's emotional limitations did not satisfy listing standards. Given this body of proof, substantial evidence supported the ALJ's Step 3 conclusions. There was no error here.

Likewise, substantial evidence supported the ALJ's ultimate RFC determination. Byler's self-reported activities of daily living, which included periodic employment, suggested that he could perform some work. His clinical record suggested that he retained the ability to at least do light work. Moreover, every expert who assessed his case found that Byler could meet the physical and emotional demands of the workplace. Finally, the ALJ accommodated Byler's emotional impairments by confining him to simple and routine tasks, involving only simple, work-related decisions; few, if any, workplace changes and no production pace work; and only occasional interaction with supervisors, coworkers, and the public. (Tr. 23).  In the absence of clinical or medical opinion evidence suggesting that Byler suffered from some higher level of impairment, substantial evidence supported this RFC determination. This argument fails.

At bottom, it appears that the plaintiff is requesting that this Court re-weigh the evidence. This we may not do. See Chandler, 667 F.3d at 359 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations"); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way

35

which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and will affirm that decision.[4]

## IV.    Conclusion

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying this claim will be AFFIRMED.

---

[4] Byler presents one other argument albeit in an enigmatic fashion, suggesting in passing that, given the closed period of benefits that Byler received through August of 2016, this case should have been viewed as a reinstatement of benefits during a three-year period of continuing review. (Doc. 12, at 21-22). The Commissioner has not directly responded to this argument, but we will decline the remand on the basis of this largely undeveloped contention. In particular, we note that the ALJ acknowledged the prior closed claim at the December 8, 2021, hearing (tr. 38), however, that closed period claim ended in August of 2016, more than three years after Byler's current alleged onset of disability in this case, November 2019. On these facts Byler points to no legal authority which would have mandated special treatment of this temporally remote event by the ALJ and we perceive no prejudicial error here.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: April 13, 2026